**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1108
_____

UNITED STATES OF AMERICA

v.

SHAWN LOWE,

Appellant
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 2-11-cr-00111-001)
District Judge: Hon. J. Curtis Joyner
_____

Argued: October 28, 2014
_____

BEFORE: McKEE, <u>Chief Judge</u>, GREENAWAY, JR. and
KRAUSE, <u>Circuit Judges</u>

(Filed: July 02, 2015)

LEIGH M. SKIPPER, ESQ.
Chief Federal Defender
BRETT G. SWEITZER, ESQ.
Assistant Federal Defender
Chief of Appeals
ROBERT EPSTEIN, ESQ. **[ARGUED]**
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 540 West - Curtis Center

601 Walnut Street
Philadelphia, Pennsylvania 19106

*Attorneys for Appellant*

ZANE DAVID MEMEGER, ESQ.
United States Attorney
ROBERT A. ZAUZMER, ESQ. **[ARGUED]**
Assistant United States Attorney
Chief of Appeals
BERNADETTE McKEON, ESQ.
Assistant United States Attorney
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*Attorneys for Appellee*

_____

OPINION
_____


McKEE, Chief Judge

Shawn Lowe appeals the conviction for illegally possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), that resulted from his conditional guilty plea. The only issue raised is whether the District Court erred in denying his suppression motion. The matter comes before us after a different panel of this Court remanded Lowe's challenge to the suppression ruling back to the District Court for fact-finding and resolution of the conflicting suppression hearing testimony. *See United States v. Lowe*, 525 F. App'x 167 (3d Cir. 2013) (*Lowe I*). On remand, neither party supplemented the record with additional evidence. The District Court merely entered findings of fact and conclusions

2

of law and again denied Lowe's motion to suppress. This appeal followed.[1]

Lowe's sole argument is that, because the police did not have reasonable suspicion to conduct a *Terry* stop when they seized him, the evidence discovered as a result of the stop and corresponding frisk was obtained in violation of the Fourth Amendment and should have been suppressed. We agree. We now hold that the District Court erred in identifying the moment of seizure, and that the officers did not have reasonable suspicion when they actually seized Lowe. Accordingly, we will reverse the District Court's denial of Lowe's suppression motion.

## I.

"We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and we exercise plenary review over questions of law." *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006). Our review of the District Court's determination of the moment of seizure under the Fourth Amendment, as well as whether a seizure is supported by reasonable suspicion, is *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003). A district court's factual "finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Accordingly, '[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety,' we will not reverse it even if, as the trier of fact, we would have weighed the evidence differently." *United States v. Price*, 558 F.3d 270, 276–77 (3d Cir. 2009) (internal citations omitted) (alteration in original).

## II.

In *Lowe I*, we were presented with conflicting versions of the facts necessary to determine the moment of seizure.

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over this timely appeal from a final decision of a district court under 28 U.S.C. § 1291.

Accordingly, as noted above, we remanded "to enable the District Court to make specific written findings of fact and conclusions of law." 525 F. App'x at 168. In his concurring opinion, Judge Ambro highlighted the gaps in the fact-finding that the District Court needed to address on remand. He explained that if Lowe "may have stepped backward initially on the order to stop walking, this did not undermine his submitting to that order." *Id.* at 170 (Ambro, J., concurring) (citing *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010). In Judge Ambro's view, "to any extent Lowe merely 'looked like he was getting ready to run' per officer testimony" but did not actually run, he still would have submitted, and if Lowe "effectively halted at the officers' behest," he "was seized at the outset of the encounter." *Id.* Thus, in *Lowe I* the panel concluded "vacate[d] and remand[ed] the matter to enable the District Court to make specific written findings of fact." *Id.* at 168. On remand, the District Court issued conclusions of law and factual findings that described the encounter more fully.

## A.

On September 19, 2010, at approximately 4:00 a.m., Philadelphia police officers McGinnis and Campbell received a radio call reporting "flash information of a black male wearing a gray hoodie with a gun in his waistband talking to a female that was at . . . 914 North Markoe Street outside." *United States v. Lowe*, Crim. No. 11-111, 2014 WL 99452, at *1 (E.D. Pa. Jan. 8, 2014). The tip was anonymous. The 900 block of North Markoe Street is located in "a violent, high crime area known for drug crimes." *Id.* Approximately 90 minutes before receiving the radio call, Officers Campbell and McGinnis had received a call regarding an alleged gun shot at the 900 block of 49th Street, which is "around the corner" from 914 North Markoe Street. *Id.* The officers testified that they knew that a shot had been fired at a house, but that no one had been shot and no suspect had been apprehended. 914 North Markoe Street was the home address of Tamika Witherspoon, who is Lowe's close friend.

Officers McGinnis and Campbell were near 914 North Markoe Street when they received the radio call, and they immediately drove to the address. They arrived within two

4

minutes of receiving the call. The officers initially turned their police sirens and lights on, but they turned them off when they were about a block and a half away from the address. The officers parked their police car roughly 50 to 60 feet away from the house. Within seconds, two additional police cars pulled in behind their car. Officer Pezzeca was in one of the additional police cars. Officers McGinnis and Campbell, followed shortly thereafter by Officer Pezzeca and another officer, got out of their cars and quickly moved towards Lowe. As the officers approached the house, they saw Lowe speaking with Witherspoon in front of 914 North Markoe Street. Lowe was wearing a gray hoodie; his hands were in the hoodie pockets and were not visible to the officers. However, the officers did not see a gun or anything indicating that Lowe had a gun, nor did they see or hear any argument or disturbance when they pulled up to the residence. There was a construction fence on the sidewalk preventing access to the north of Witherspoon's house.

The District Court recounted the "varying versions" provided by the officers of what happened next. *Id.* at 2. Officer McGinnis testified that, as he and Officer Campbell approached Lowe, he asked Lowe to remove his hands from his pockets "five to ten times," and Lowe instead "froze" and looked both ways over his shoulders. *Id.* According to Officer McGinnis, only after he gave five to ten commands and drew his gun did Lowe take his hands out of his pockets and start to move towards the wall, at which point the officers pushed Lowe against the wall. In contrast, Officer Campbell testified that Lowe did put up his hands in response to the command to stop and do so, and he testified that Lowe voluntarily placed his hands on the wall. Officer Pezzeca testified that as Officers Campbell and McGinnis approached Lowe and told him "several" times to put his hands up, Lowe backed away from the officers and kept his hands in his pockets until Officers Campbell and McGinnis grabbed Lowe and placed him against the wall. *Id.* All of the officers agreed that the frisk took place by the wall and that, following a brief struggle that ensued when Lowe reached for his waistband during the frisk, a firearm was recovered.

This sequence of events unfolded quickly: Officer McGinnis estimated that less than a minute elapsed between

the first command and when Lowe moved to the wall, and Officer Campbell indicated that the whole incident, from his arrival on the scene to the struggle with Lowe and the recovery of the firearm, took less than two minutes.

In its "Findings of Fact," the District Court described these events as follows:

[W]hen the officers first arrived on the scene, Mr. Lowe was standing in front of 914 North Markoe. As the officers steadily moved toward Mr. Lowe, he took several steps backing away from them. He was prevented from moving back more than a few steps by the construction fence next to 914 North Markoe Street. [] The Court also finds that Officers McGinnis and Campbell gave Mr. Lowe multiple commands to raise his hands or take his hands out of his pockets while in close proximity to Mr. Lowe. Mr. Lowe did not initially comply.

*Lowe*, 2014 WL 99452, at *3. In reaching this conclusion, the District Court explained that it "afford[ed] more weight to the congruent testimony of Officers McGinnis and Pezzeca, whose accounts provide a consistent story, and slightly less weight to Officer Campbell's recollection regarding Mr. Lowe's compliance with the order to raise his hands." *Id.*

The District Court did not resolve some significant conflicts in the police officers' testimony. This includes conflicting testimony regarding whether Lowe put his hands on the wall voluntarily, or whether his hands were placed there by the officers. The District Court also failed to resolve the discrepancies in the police officers' testimony about the number of times they ordered Lowe to show his hands and their distance from him when they issued those orders. Though the District Court's lack of precision fuels some of the appellate arguments, the Findings of Fact that the court did make are sufficient to allow us to determine the legality of Lowe's seizure.

**B.**

6

The District Court reached the following conclusion of law regarding when the interaction became a stop for Fourth Amendment purposes:

The encounter between the officers and Mr. Lowe did not become a Terry stop at the officers' *first* command that Lowe remove his hands from his pockets; instead, "the interaction became a stop" when the officers *repeated* their commands, "ma[king] it clear that [the suspect] was not free to ignore [the officers] and would not be left alone until he complied." *Johnson v. Campbell,* 332 F.3d 199, 206 (3d. Cir. 2003) (finding that stop occurred after officer's second command to individual to roll down his car window).

*Lowe*, 2014 WL 99452, at *5. The District Court thus held that "Lowe was seized within the meaning of the Fourth Amendment at the point when the officers repeated their commands to him, and he responded by not fleeing." *Id.* Accordingly, the District Court found that Lowe's failure to show his hands in response to the officers' initial commands could be considered in the totality of the circumstances in evaluating reasonable suspicion. The court found that the officers were aware of the following pieces of information at the moment of seizure:

an anonymous tip that a male matching Mr. Lowe's description was engaged in criminal activity, the fact that 914 North Markoe Street was located in a high-crime neighborhood in which a shooting had occurred over an hour earlier, the late hour of the night, and the fact that, when Mr. Lowe was approached and asked to show his hands, he refused to remove his hands from his hoodie pockets.

*Id.* Based on its conclusion that these facts provided reasonable suspicion to conduct the search of Lowe that disclosed the firearm, the District Court denied Lowe's motion to suppress.

## III.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Though law enforcement officers ordinarily must obtain a warrant based

7

on probable cause before conducting a seizure, in *Terry v. Ohio* the Supreme Court articulated an exception that allows law enforcement to conduct a brief investigatory stop in limited circumstances. 392 U.S. 1 (1968). Under *Terry* and its progeny, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The reasonable suspicion that justifies the *Terry* stop of a suspect also justifies a subsequent protective frisk of that suspect, where officers have reason to believe that the suspect may pose a danger to the officers. *Terry*, 392 U.S. at 30.

In assessing the legality of a *Terry* stop, we must first pinpoint the moment of the seizure and then determine "whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity." *Campbell*, 332 F.3d at 205. "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Where a seizure falls in the latter category, we determine if there has been a "show of authority" using an objective test: "whether the officer's words and actions would have conveyed . . . to a reasonable person" that he was not free to leave. *Hodari D.*, 499 U.S. at 628.[2]

Whether an individual has "submitted" to a show of authority depends on both the nature of the show of authority

---

[2] The Supreme Court has sometimes referenced this test in describing a "seizure," particularly in the context of traffic stops. *See, e.g.*, *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); *see also Florida v. Bostick*, 501 U.S. 429, 435–36 (1991)). However, *Hodari D.* makes clear that the "so-called *Mendenhall* test" pertains to the "show of authority" component of a seizure, and that it "states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a 'show of authority.'" *Hodari D.*, 499 U.S. at 627–28.

8

as well as the suspect's conduct at the moment the officer asserted his or her authority.  When a suspect flees after a show of authority, the moment of submission is often quite clear:  It is when the fleeing suspect stops, whether voluntarily or as a result of the application of physical force.  *See id.* at 628–29.  But different factors must be considered when an individual is already stationary, or "when an individual's submission to a show of governmental authority takes the form of passive acquiescence."  *Brendlin v. California*, 551 U.S. 249, 255 (2007).  Thus, while "a fleeing man is not seized until he is physically overpowered, . . . one sitting in a chair may submit to authority by not getting up to run away."  *Id.* at 262.  In either case, a show of authority without actual submission is no more than an "attempted seizure," and a suspect's conduct in the interval between the show of authority and the submission can be considered in determining the reasonableness of the eventual seizure.  *Id.* at 254 (citing *Hodari D.*, 499 U.S. at 626 n.2).

We therefore turn to the two questions presented in this case: (1) When did Lowe actually submit to the show of authority?, and (2) Did the facts known to the officers at that moment of seizure give rise to reasonable suspicion?

## A.

The District Court cited to *Campbell*, 332 F.3d at 206, in finding that the seizure occurred the instant that the officers *repeated* their commands to Lowe.  *Lowe*, 2014 WL 99452, at *5.  It concluded that Lowe "submitted" at that moment by "not fleeing."  *Id.*  However, *Campbell* arose in a very different context and is therefore of little assistance to our inquiry.  There, a single officer made a hand gesture to an individual seated in a parked van indicating that the officer wanted that individual to roll down his window.  *Campbell*, 332 F.3d at 203.  When the individual did not comply, the officer persisted in making the same request.  *Id.*  We found that, because an objective person in the individual's situation would have felt free to decline the officer's *first* gesture, the first request was not a show of authority for Fourth Amendment purposes.  *Id.* at 206.  Rather, we held that an objective person would only reasonably not have felt free to decline the interaction after the officer *repeated* his motion,

9

and we thus concluded that that the repetition of the motion was the "show of authority" component of the seizure under the Fourth Amendment. *Id.* Since the individual submitted immediately by remaining seated in the van, he was seized when the officer repeated his request. *Id.* That case does not, however, stand for a *per se* rule that an officer does not assert his or her authority for Fourth Amendment purposes until he or she repeats a command.

To the contrary, in determining whether there has been a show of authority, courts must examine all of the surrounding circumstances to determine whether a reasonable person would have felt free to decline the interaction with law enforcement. *See Brendlin*, 551 U.S. at 255. In *Mendenhall*, Justice Stewart identified such factors as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.). Here, *three marked police cars* nearly simultaneously arrived at Ms. Witherspoon's residence at 4 o'clock in the morning. *Four uniformed* police officers immediately got out of their patrol cars and approached Lowe and Witherspoon, *commanding* them to show their hands. Although the District Court did not make explicit findings about the speed with which the officers approached Lowe, the record indicates that they arrived in a hurried manner and at least one drew his firearm at some point during the encounter. A reasonable person in Lowe's position would not have felt free to decline this interaction, turn, and leave.

Indeed, the Government candidly conceded that the officers made a show of authority from the moment they first approached Lowe.[3] *See United States v. Waterman*, 569 F.3d 144, 144–46 (3d Cir. 2009) (holding that a show of authority occurred when two uniformed police officers approached a house and commanded that people on the porch show their

---

[3] At the oral argument in *Lowe I*, the Government made this concession during an exchange with the Court. *See* Supp. App. 37 ("[A.U.S.A.]: We are not disputing that there was a show of authority, and I hope I'm clear on that.").

10

hands); *cf. United States v. Smith*, 575 F.3d 308, 314 (3d Cir. 2009) (holding that there was no show of authority when two officers repeatedly asked an individual "Where is your girl's house?", but where "the two officers were still in their car, neither officer displayed his weapon, there was no physical touching, and no indication as to the language or tone of the officer's voice that might have signaled a clear show of authority").

On this record, the officers' approach constituted a show of authority, as a reasonable person in Lowe's position would not have felt free to decline the interaction or leave. However, that does not end our inquiry. We must also determine when Lowe submitted to that show of authority. Because the order of events is critical here, we must address the parties' arguments regarding the District Court's Findings of Fact before inquiring into when Lowe submitted.

**B.**

When read chronologically, the findings indicate that Lowe stepped backwards "[a]s the officers steadily moved toward [him,]" and that the officers did not "g[i]ve Mr. Lowe multiple commands to raise his hands or take his hands out of his pockets" until they were "in close proximity." *Lowe*, 2014 WL 99452, at *3; *see also Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 498 (3d Cir. 2002) (according plain meaning to the district court's choice of language in affirming its "implicit" findings of fact). These findings control because they are not clearly erroneous. Rather, they are supported by the record.[4] *See United States v. Roberson*, 90 F.3d 75, 77 (3d Cir. 1996).

---

[4] Many of Government's arguments depend on reading the District Court's factual findings as ambiguous as to the order of events, and on adopting the Government's version of the encounter. However, the Government bears the burden at a suppression hearing where, as here, the search or seizure was conducted without a warrant. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). It must establish by a preponderance of the evidence when the seizure occurred and that it was then supported by reasonable suspicion. *See id.* Here, not only did the Government initially fail to make a clear showing as to the sequence of events, but it also failed

The Government's central argument is that Lowe did not submit to the initial show of authority because he failed to show his hands in response to the officers' commands. As noted earlier, the Supreme Court has explained that "[an individual] sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262. The Government's argument invites us to add "unless the police have instructed him to stand up" to the analysis. Neither Supreme Court precedent nor the law of our Circuit supports such a qualification. *See id.* (explaining that responding to a show of authority by staying put is a means of passively submitting to that authority); *Campbell*, 332 F.3d at 206 (holding that the defendant submitted to a show of authority by remaining in place even though he declined the police officer's initial request to roll down his window and refused to provide the officer with his identification).

Instead, failure to submit has been found where a suspect takes action that clearly indicates that he "does not yield" to the officers' show of authority. *Hodari D.*, 499 U.S. at 626. Action—not passivity—has been the touchstone of our analysis. The most obvious example is when a suspect runs from the police. *See Wardlow*, 528 U.S. at 121; *Hodari D.*, 499 U.S. at 626; *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989). However, headlong flight is not required if a suspect otherwise takes action to evade or threaten a police officer. For example, in *United States v. Waterman*, we found no submission where a suspect responded to commands to show his hands by reaching to his waistband and retreating through a door behind him and out of the officers' presence entirely. 569 F.3d at 145. Other courts have found no submission when a suspect already in motion refuses to stop when approached by an officer, see *United States v. Freeman*, 735 F.3d 92, 95–97 (2d Cir. 2013) (holding that a suspect who continued walking when approached by a police officer

to supplement the record after we remanded in *Lowe I* for exactly this type of fact-finding. We will not, under these circumstances, indulge in hypotheticals and interpret alleged ambiguity in the District Court's findings in favor of the party with the burden of proof—the Government. *See United States v. Coward*, 296 F.3d 176, 179–80 (3d Cir. 2002).

did not submit until physically restrained by the officer); *United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010) (noting that, "for a person who is moving, to 'yield' most sensibly means to stop"), or when a suspect makes suspicious motions consistent with reaching for a weapon, see *United States v. Johnson*, 212 F.3d 1313, 1316–17 (D.C. Cir. 2000) (holding that a suspect did not submit to a show of authority when he made "continued furtive gestures" including "shoving down" motions that were "suggestive of hiding (or retrieving) a gun").

Unlike the suspects in those cases, Lowe stayed put in front of Witherspoon's house when the officers converged and shouted commands at him to show his hands. At that point, the record does not reflect that he made any threatening gesture or moved his hands or arms in any way, much less that he reached for a weapon or otherwise acted to rebuff the officers' authority. Indeed, one responding officer described him as "frozen" and another testified that Lowe looked "shocked." When an officer effectuates a *Terry* stop, his or her "show of authority" is an implicit or explicit command that the person *stop*. *See Hodari D.*, 499 U.S. at 626 (discussing how the word "seizure," in "[t]he language of the Fourth Amendment," necessarily implies an actual stop). We thus reject the Government's contention that, because Lowe did not comply with the officers' order to show his hands, he failed to "submit" for Fourth Amendment purposes to the officers' show of authority—which was, of course, an entirely different order. Indeed, "[i]t would be an unnatural reading of the case law to hold that a defendant who is ordered to stop is not seized until he stops *and* complies with a subsequent order to raise his hands." *Johnson*, 620 F.3d at 691. Rather, we hold that when a stationary suspect reacts to a show of authority by not fleeing, making no threatening movement or gesture, and remaining stationary, he has submitted under the Fourth Amendment and a seizure has been effectuated.

We also reject the Government's argument that Lowe did not immediately submit to the show of authority because the District Court found that Lowe "took several steps backing away" as the officers approached. *Lowe*, 2014 WL 99452, at *3. The Government analogizes those steps back to the fleeing suspect in *Hodari D.*, arguing that since Lowe did

13

not remain in place, he had not yet submitted before refusing to raise his hands. Therefore, the Government argues, his steps can be considered in the reasonable suspicion analysis. We decline to equate Lowe's few backward steps upon seeing several uniformed officers rush toward him with headlong flight—particularly where the District Court's findings are to the contrary. The District Court expressly found that "Mr. Lowe submitted to the officers' show of authority *by not fleeing* from them when the commands to take his hands out of his pockets were repeated." *Lowe*, 2014 WL 99452, at *5 (emphasis added).[5] Indeed, the District Court found Lowe's steps so innocuous that it did not even identify them as a factor contributing to reasonable suspicion in its discussion of relevant facts known to the officers at the time of seizure. *See id.* Therefore, we agree with the determination, implicit in the District Court's findings, that a few startled steps back in the face of onrushing, armed police officers is entirely consistent with a surprised reaction and even acquiescence.[6] Without Lowe ever having turned around in an attempt to walk, much less run, these few steps backward hardly could transform his limited movement in response to the onrushing officers into flight. *See Hodari D.*, 499 U.S. at 626.

---

[5] As noted, the District Court erred by finding that the officers' show of authority did not occur until they repeated their commands. However, the finding that Lowe did not flee remains instructive as to how the District Court viewed Lowe's steps backwards as the officers approached. It did not characterize them as flight.

[6] While the Government would have us interpret the District Court's statement that Lowe "was prevented from moving back more than a few steps by the construction fence" to mean that Lowe intended to flee or was attempting to flee, that argument disregards the District Court's explicit finding that Lowe was "not fleeing" and is not supported by authority. Courts have not considered a suspect's subjective intent in this situation. Indeed, "a person who has actually stopped in response to officers' commands but who looks like he *might* run" still has submitted to an order to stop. *Johnson*, 620 F.3d at 692.

14

In sum, we hold that Lowe submitted to the officers' authority by staying put in front of 914 North Markoe Street. Neither his action, in taking a few steps backwards before stopping, nor his inaction, in keeping his hands immobile despite commands to move them, negated that submission.

## C.

Police may only seize a person consistent with the Fourth Amendment if they have reasonable, articulable, and individualized suspicion that a suspect is engaged in criminal activity. *See Wardlow*, 528 U.S. at 123; *Terry*, 392 U.S. 1. Here, the facts known to the officers when they first approached Lowe included "an anonymous tip that a male matching Mr. Lowe's description was [in possession of a gun], the fact that 914 North Markoe Street was located in a high-crime neighborhood in which a shooting had occurred over an hour earlier, [and] the late hour of the night." *Lowe*, 2014 WL 99452, at *5. The Government conceded in its Appellee Brief and at oral argument in *Lowe I*, as it must, that these facts alone did not give rise to reasonable suspicion to stop Lowe. Gov. Br. 19; Supp. App. 46–47; *see Florida v. J.L.*, 529 U.S. 266, 270–72 (2000); *Roberson*, 90 F.3d at 80; *cf. United States v. Valentine*, 232 F.3d 350, 357 (3d. Cir 2000) ("[W]e conclude that the officers had reasonable suspicion after they received the face-to-face tip, were in a high-crime area at 1:00 a.m., and saw Valentine and his two companions walk away as soon as they noticed the police car.").

The officers made a show of authority to which Lowe submitted as they approached. No additional facts developed before the stop would have supported a reasonable suspicion that Lowe was engaged in criminal activity. Thus, contrary to the Government's arguments, we have no occasion to consider Lowe's failure to comply with the order to show his hands, as that noncompliance happened after the moment of seizure. Additionally, we need not resolve whether Lowe's steps backwards were taken a moment before or after the seizure, as even if Lowe had stepped back before he was seized, that extra fact in these circumstances would not have given the officers reasonable suspicion. *See Lowe*, 2014 WL 99452, at *3. As explained above, we concur with the

District Court that the steps were not suspicious and were more suggestive of simple surprise than criminality. Moreover, both the tip and its level of corroboration here are very similar to the circumstances in *Florida v. J.L.*[7] The *J.L.* Court not only held that the officers did not have reasonable suspicion for the stop, it emphasized that it was not even a "close case." *Id.* at 271.

As we have stated, our reasonable suspicion analysis must be limited to the facts known to the officers when they effected a *Terry* stop. Thus, because we conclude that Lowe was seized when the officers approached him and he stayed put outside Witherspoon's house, the Government lacked reasonable suspicion at the moment of seizure.

**IV.**

We realize that it is in the interest of public safety and the safety of police for officers to be able to ascertain whether people are armed, and that one of the most efficient ways to do this is for officers to stop and frisk individuals who have

---

[7] In *J.L.*, police received a tip that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun[,]" and they subsequently stopped, frisked, and recovered a gun from a man at that bus stop who met the description. 529 U.S. at 268. Even considering the neighborhood and hour of the night, the officers had less reason to be suspicious when they approached than in a case the Court has called "borderline." *Id.* at 271 (referring to *Alabama v. White*, 496 U.S. 325, 329 (1990), where police received a tip that a woman would carry cocaine as she left a specific apartment, entered a specific car, and drove to a specific hotel, and where officers conducted surveillance and confirmed that the tipster had accurately predicted the woman's movements). Almost none of the aspects of a tip that indicate reliability are present here, see *Brown*, 448 F.3d at 249–50 (3d Cir. 2006), and the contents of the tip corroborated by the officers at the scene were the basic descriptions of Lowe's location and appearance. *See J.L.*, 529 U.S. at 272 ("[A] tip [must] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.").

16

aroused suspicion. However, the Fourth Amendment limits law enforcement's power to seize individuals to situations where their suspicion of criminal activity is specific, individualized, and reasonable. *Terry*, 392 U.S. at 27. Officers proceeding on the basis of an anonymous tip that does not itself give rise to reasonable suspicion have many tools at their disposal to gather additional evidence that could satisfy the requirements of *Terry* and therefore allow police to stop the individual under appropriate circumstances. *See Adams v. Williams*, 407 U.S. 143, 147 (1972) ("Some tips, completely lacking in indicia of reliability, . . . require further investigation before a forcible stop of a suspect would be authorized."). These include investigation, surveillance, and even approaching the suspect without a show of authority to pose questions and to make observations about the suspect's conduct and demeanor. *See White*, 496 U.S. at 331 (describing how officers conducted surveillance to corroborate details in a tip and developed reasonable suspicion); *Mendenhall*, 446 U.S. at 554 (explaining that conversations between individuals and law enforcement officers do not necessarily implicate the Fourth Amendment). Officers' observations during such an inquiry or investigation could create reasonable suspicion necessary to conduct a *Terry* stop. However, reasonable suspicion is always evaluated as of the moment of seizure, and we cannot consider facts that develop after that moment. *See Campbell*, 332 F.3d at 205.

Because this record does not establish that the police had reasonable suspicion to justify stopping Lowe, the evidence recovered as a result of the ensuing search is the "fruit of the poisonous tree" and must be suppressed. *See Brown*, 448 F.3d at 244 (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

17