PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-3298
_____

UNITED STATES OF AMERICA

v.

SHIHEEM AMOS,
                    Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(District Court Criminal No. 2-18-cr-00571-001)
District Judge:  Honorable Gerald J. Pappert

Argued: January 23, 2023

BEFORE:  BIBAS, NYGAARD, and FUENTES,
*Circuit Judges*


(Filed: December 14, 2023)

Anthony J. Carissimi
Timothy M. Stengel
Robert A. Zauzmer [Argued]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
		*Counsel for Appellee*

Abigail E. Horn [Argued]
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
		*Counsel for Appellant*

_____

OPINION OF THE COURT

_____

NYGAARD, *Circuit Judge.*

Shiheem Amos appeals the District Court's denial of his motion to suppress and his criminal sentence. He first argues that the court erred when it denied his motion to suppress a firearm because he was seized without reasonable suspicion. Second, he argues that the court erred when it included a United States Sentencing Guidelines' crime of violence enhancement for a previous state court conviction and sentenced him to 62 months' imprisonment. We will affirm the denial of the motion to suppress, but because Amos's prior conviction is not a crime of violence, we will remand for resentencing.

## I.    Background

On September 26, 2018, police officers Hugo Lemos and Nicholas Mastroianni were working the overnight shift as patrol officers in southwest Philadelphia. At about 2:00 a.m., they received a radio call for a person screaming at the intersection of 65th Street and Dicks Avenue outside Eddie's Café and a man assaulting a woman on the highway. The officers were nearby and arrived at Eddie's Café within two minutes. No one was outside Eddie's Café.

The officers continued driving past the café on 65th Street and Officer Lemos saw one pedestrian, later discovered to be Shiheem Amos, walking alone in an alleyway across the street. Amos was walking toward 64th Street and was "stomping [his] feet, and kind of throwing his arms around," according to Officer Lemos. App'x 85. The officers drove around the block to cut Amos off, driving the wrong way down a one-way street with the overhead lights on. The officers parked midway in the entrance to the alleyway and Amos continued to walk toward them. Officer Lemos got out of the vehicle and told Amos to stop and put his hands up.[1] Officer Lemos testified that Amos placed his hands at a "halfway point" and stopped

[1] There is some discrepancy about where Officer Lemos was when he asked Amos to stop. At the preliminary hearing, he testified that he was out of the car. At the suppression hearing, he testified that he was still in the car and yelled out the window. He testified that the earlier testimony was probably accurate. The District Court explained that any discrepancy did not impact its assessment of Officer Lemos's credibility or alter its legal analysis.

for "[m]aybe a second." App'x 89, 91. Amos then ran diagonally and reached about three car lengths away from the officers. Officer Mastroianni quickly caught up with Amos and handcuffed him. At that time, a handgun fell from Amos's pocket, a firearm he was not permitted to carry due to his previous conviction of a felony punishable by a term of imprisonment exceeding one year.

Amos was charged with one count of possession of a firearm by a felon under 18 U.S.C. § 922(g). He filed a motion to suppress the gun and argued that he was seized pre-flight without reasonable suspicion. After an evidentiary hearing, the District Court denied the motion, finding no pre-flight seizure occurred. Amos then pleaded guilty pursuant to a plea agreement.[2]

At sentencing, the parties disputed the applicability of a sentencing enhancement under Sentencing Guidelines § 2K2.1(a)(4)(A) which applies to defendants previously convicted of a felony "crime of violence." The Government argued that Amos's 2008 Pennsylvania state conviction for aggravated

---

[2] Amos's plea agreement waived appellate and collateral challenges with only a few exceptions, including that he could challenge the denial of his motion to suppress and he could raise ineffective assistance of counsel. As such, Amos originally couched his crime of violence argument in ineffective assistance of counsel. However, the Government agreed to waive the appellate waiver so we can exercise ordinary review of the guideline challenge. Amos confirms this, explaining that the ineffective assistance claim is no longer necessary, and the Court can review the issue squarely.

4

assault, a second-degree felony, qualified as a predicate crime of violence.

The state court records did not identify the specific second-degree subsection of the aggravated assault statute, 18 Pa. Cons. Stat. § 2702(a)(3)–(7), under which Amos was convicted. Accordingly, the Government had to prove that all five subsections qualified as a crime of violence. The District Court found that the Government met its burden and applied the enhancement. This resulted in a base offense level of twenty, from which the court deducted two levels for acceptance of responsibility, making it eighteen. Combined with Amos's criminal history category of six, he was subject to an advisory Guidelines' range of 57 to 71 months' imprisonment. Without the enhancement, Amos's range would have been 30 to 37 months' imprisonment. The court imposed a sentence of 62 months' imprisonment followed by three years of supervised release. Amos timely appealed.[3]

## II.   Motion to Suppress

We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise plenary review over questions of law. *United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002).

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

A. The Fourth Amendment Suppression Analysis

The Fourth Amendment prohibits "unreasonable searches and seizures…." U.S. Const. amend. IV. Unless an exception applies, a seizure "must be effectuated with a warrant based on probable cause" in order to be reasonable under the Fourth Amendment. *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). One such exception to the warrant requirement was established in *Terry v. Ohio*, 392 U.S. 1 (1968). When a police officer has a "reasonable, articulable suspicion that criminal activity is afoot," he may conduct a brief, investigatory stop without a warrant, *i.e.*, a "*Terry* stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* However, an officer must "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity" to establish reasonable suspicion. *Id.* at 124 (quoting *Terry*, 392 U.S. at 27). If a *Terry* stop is conducted without reasonable suspicion of criminal activity, any evidence obtained must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (internal quotation marks omitted).

Reasonable suspicion is evaluated at the moment of a seizure, so the first step in a suppression analysis is to determine when the seizure occurred. *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009). When determining whether a seizure occurred, we must consider "all the circumstances surrounding the encounter." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). If a seizure occurred pre-flight, then the

6

flight "plays no role in the reasonable suspicion analysis." *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006).

A seizure can occur in two ways: 1) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or 2) "submission to a 'show of authority.'" *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). There is no dispute that the police officers did not touch Amos before he tried to flee, so a seizure could only have occurred pre-flight if Amos 1) submitted 2) to a show of authority. The absence of either element is fatal to his appeal.

B. The Police Officers Showed Authority Because No Reasonable Person in Amos's Position Would Have Felt Free to Leave

We first address whether the police officers showed authority when they encountered Amos in the alleyway. The District Court found no show of authority by the officers because they did not communicate to Amos that he was not free to leave. The court relied on the facts that the officers did not activate the police car's lights or sirens, brandish their weapons, block Amos's path, come into contact with Amos, or make any threats or intimidating movements.

An objective test determines whether there has been a show of authority; we must ask whether a reasonable person would have believed he was not free to leave based on the officer's words and actions. *Hodari D*, 499 U.S. at 628. Factors such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the

7

person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" may indicate a show of authority occurred. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion).

The Government hardly protests that the officers did not show authority. *See* Appellee Br. 12 ("In this matter, whether or not there was a show of authority in the officer's command to stop, there is no question that Amos did not comply before running on foot."); *see also id.* at 15 ("Assuming Officer Lemos' single request that the defendant stop and raise hands was a show of authority, the defendant never submitted to it."). In a footnote, the Government notes that the District Court did not find a show of authority and says, "that conclusion alone resolves this case." *Id.* at 16 n.3.

Amos argues that the police officers' show of authority was strong. He asserts that late at night, he was pursued by two uniformed officers in a marked patrol car. The officers emerged the wrong way out of a one-way street and parked in the mouth of the alleyway from where Amos was emerging. He argues that based on our caselaw, the officers showed authority because no reasonable person would have felt free to leave.

We agree with Amos that the officers displayed a show of authority. Under the circumstances of the encounter between Amos and the officers, a reasonable person would have believed he was not free to leave. While the District Court is right that the officers did not brandish their weapons or make any threats, the record shows that at 2:00 a.m. a marked police car

8

parked against the flow of traffic midway in the entrance to the alleyway from where Amos was walking. The car was parked in Amos's direct forward path and inside were two uniformed officers. One officer immediately got out and approached Amos, commanding him to stop and show his hands.

Additionally, the record indicates the officers arrived in a hurried manner as they drove the wrong way against traffic with their lights on initially to get in Amos's path. Similar facts were presented in *United States v. Lowe*, 791 F.3d 424 (3d Cir. 2015). In *Lowe*, multiple marked police cars, which used their lights and sirens en route to their destination, arrived at a residence in the middle of the night. *Id.* at 428. Multiple uniformed officers approached the defendant and commanded that he show his hands. *Id.* at 431–32. Based on the record, we found that "the officers' approach constituted a show of authority, as a reasonable person in Lowe's position would not have felt free to decline the interaction or leave." *Id.* at 432.

We think that under the circumstances presented to Amos, a reasonable individual would have understood that the officers were exercising control and showing authority. No reasonable person who is commanded to stop and show their hands in the middle of the night by uniformed officers with a marked police car would feel free to ignore the command and walk away. We have previously found a "clear show of authority" when an officer informed two robbery suspects that the "victim was being brought over to identify them as possible suspects and, if they were not identified, they would be free to go—necessarily implying that they were not free to leave." *Brown*, 448 F.3d at 245. We went on to say that the officer's demand that the suspects submit to a pat-down "would have

9

conveyed … to a reasonable person" that "he was being ordered to restrict his movement." *Id.* (quoting *Hodari D.*, 499 U.S. at 628). And we have assumed a show of authority when officers instruct a defendant to place his hands on their vehicle. *See Smith*, 575 F.3d at 314. Today, we confirm that assumption. When a uniformed officer approaches an individual in the middle of the night in a marked police car and commands that person to stop and raise his or her hands, that is a show of authority.

C. Amos Did Not Submit to the Officer's Show of Authority

We next consider submission to authority. Although Amos is correct that the officers displayed a show of authority, he must have also submitted to that display in order to have been seized. "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007).

When Officer Lemos told Amos to stop and put his hands up, Amos placed his hands at a "halfway point" and stopped for "[m]aybe a second" before he ran. App'x 89, 91. The District Court found that Amos did not submit to the officers when he fled before his hands were all the way up.

When determining whether an individual has submitted to a show of authority, we consider both the nature of the show of authority and the individual's conduct at that moment. *See Lowe*, 791 F.3d at 430. "Thus, while 'a fleeing man is not seized until he is physically overpowered, … one sitting in a

10

chair may submit to authority by not getting up to run away.'" *Id.* at 431 (quoting *Brendlin*, 551 U.S. at 262).

Amos focuses on three cases to argue that he submitted to the officers' authority, but his reliance on those cases is misplaced. Amos asserts that in *Lowe*, the defendant "submitted even though he took several steps backward into a fence, and even though he failed to comply with the officers' commands to show his hands." Appellant Br. 19. But we explained that Lowe stayed put where he was when the officers converged and was described by officers as "frozen" and "shocked." *Lowe*, 791 F.3d at 433. We explicitly held that "when a *stationary* suspect reacts to a show of authority by not fleeing, making no threatening movement or gesture, and remaining stationary, he has submitted under the Fourth Amendment and a seizure has been effectuated." *Id.* at 434 (emphasis added). Amos was not a stationary suspect and did not remain stationary. In fact, we distinguished such a circumstance in *Lowe* when we pointed out that "[o]ther courts have found no submission when a suspect already in motion refuses to stop when approached by an officer." *Id.* at 433 (collecting cases).

Amos also relies on *Brown*, which bears closer resemblance to the situation at hand but just misses the mark. As described above, the officer in *Brown* demanded that robbery suspects submit to a pat-down. 448 F.3d at 245. We explained that one suspect "clearly submitted" when he "turned to face the police car and placed his hands on the vehicle in response to [the officer's] demand." *Id.* at 246. Amos points out that we said that "conclusion is not meaningfully contradicted by [the officer's] testimony that Brown had begun to move his hands to the vehicle, but did not complete the action." *Id.* True

11

enough, but we also explained that "Brown demonstrated more than 'momentary compliance'" with the officer's demands and distinguished a situation where a defendant did not. *Id.* (distinguishing *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000)).

For its seizure analysis, we found *Brown* similar to *United States v. Coggins*, 986 F.2d 651 (3d Cir. 1993), which Amos also relies on. Coggins, who was sitting down, attempted to terminate an encounter with a Drug Enforcement Administration agent at an airport. *Id.* at 652. When he stood up and said he had to use the bathroom, the agent told him to wait. *Id.* Coggins then sat back down. *Id.* We explained that Coggins submitted to the agent's authority by sitting down. *Id.* at 654. He made a clear request to leave, the agent ordered him to stay, and Coggins complied with the order by sitting down. *Id.* Such a clear affirmative submission is missing from Amos's encounter with the officers.

Instead, Amos's actions were like those in *Valentine* and *Smith*, where we found no submission and thus no seizure. In *Valentine*, police officers approached a man who matched the description of a tip for a gunman and told him to place his hands on their police car. 232 F.3d at 352–53. The man responded, "Who, me?" and then ran toward the officers before being grabbed and wrestled to the ground. *Id.* at 353. Although we found that, under the totality of the circumstances, the officers had reasonable suspicion to stop and frisk Valentine, we went on to address whether a seizure occurred prior to his attempt to flee. *Id.* at 357–59. Valentine argued that when the officer ordered him to place his hands on the car, he momentarily complied with the order when he stopped and gave his

12

name, which in turn triggered a seizure. *Id.* at 359. But we explained that Valentine's momentary "compliance" was not a submission to authority. *Id.* "Even if Valentine paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure until [the officer] grabbed him." *Id.*

In *Smith*, officers were patrolling during the night when they encountered Smith on the street and asked him to talk. 575 F.3d at 311. He briefly complied, walking toward the officers' car and answering questions about his identification and destination. *Id.* He then provided nonresponsive answers to continued questioning, so one of the officers asked him to place his hands on the hood of the car. *Id.* Smith took two steps toward the vehicle, at which point the officers opened their car doors and Smith ran. *Id.* We relied on *Valentine* for the finding that "momentary compliance was not enough to trigger a seizure" and found that Smith's two steps towards the officers' vehicle did not indicate submission to the show of authority. *Id.* at 315–16. "[S]ubmission to authority under *Hodari D.*, 'requires at minimum, that a suspect manifest compliance with police orders.'" *Id.* at 316 (quoting *United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009)). Smith's two steps and nonresponsive answers did not represent manifest compliance. *Id.* We distinguished *Brown* by explaining that the defendant there submitted to the officer's orders to stay put prior to turning to face the car, and thus his submission was manifested at that point. *Id.* at 315.

Amos's situation is most analogous to *Smith*. *Id.* at 311. Like the officer in *Smith* who directed the suspect to put his hands on the vehicle, the officer here told Amos to stop and put

13

his hands up. Just as Smith did not comply by taking two steps forward before running, Amos's brief hesitation and raising of his hands halfway before running was not "manifest compliance." *Id.* at 316. Similarly, even though Valentine paused for a few moments and gave his name, he did not submit in a realistic sense to the officers' show of authority. *Valentine*, 232 F.3d at 359. The same can be said for Amos.

We conclude that as in *Valentine* and *Smith*, Amos's actions were not a submission to authority. In the cases where we found such a submission, the compliance was more definite than Amos's display. Amos's one- or two-second pause and halfway hand raise is clearly different than affirmatively sitting down after being told to or complying with an officer's order for more than a moment. Instead, it was more akin to the "extraordinarily brief" compliance we have recognized as insufficient submission to authority. *See United States v. Hester*, 910 F.3d 78, 86 (3d Cir. 2018) (referring to *Valentine* and *Smith*).

Accordingly, because submission "would seem to require something more than a momentary pause," Amos's brief pause and halfway hand raise was not a submission to the officers' show of authority. *Waterman*, 569 F.3d at 146. As Amos did not submit to the show of authority, no seizure occurred at that time. Thus, reasonable suspicion is not evaluated at that point. *See Smith*, 575 F.3d at 312.

When Amos ran and attempted to flee, the officers caught him and put him into handcuffs—a classic seizure. *See Hodari D.*, 499 U.S. at 624. Amos concedes that if he was not seized until after he fled, then there was reasonable suspicion

14

at that point to seize him based on his headlong flight.[4] *See Wardlow*, 528 U.S. at 124; Appellant Br. 6.

In sum, Amos's one- or two-second pause and halfway hand raise did not manifest submission to the officer's show of authority. Because Amos did not submit to the show of authority and was not seized until the officers put him in handcuffs based on reasonable suspicion, the District Court did not err in denying his motion to suppress.

### III.    Crime of Violence Sentencing Enhancement

We next consider Amos's challenge to his sentence. He has challenged only one aspect of his sentencing: the crime of violence enhancement. Whether an offense qualifies as a crime of violence is a question of law subject to plenary review. *See United States v. Wilson*, 880 F.3d 80, 83 (3d Cir. 2018).

### A.  The Elements of Force Clause

The "crime of violence" enhancement to the firearm guideline applies where "the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(4)(A). A crime of violence is any federal or state offense, punishable by imprisonment for more than a year, that "(1) has as an element the use, attempted use, or threatened use of physical force against the person of

---

[4] Because Amos was not seized until he was grabbed and handcuffed by the officers, we need not decide whether the officers had reasonable suspicion at an earlier time based on the anonymous tip.

another, or (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c)." U.S.S.G. § 4B1.2(a). There is no assertion by the parties that subsection two applies to Amos, so our inquiry is confined to subsection one, the so-called elements of force clause. "Physical force" in the elements of force clause "means *violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 138–40 (2010).[5]

## B.  The Modified Categorical Approach

When determining whether a conviction is a crime of violence, we must use the categorical approach. This requires us to "compare the elements of the statute under which the defendant was convicted to the [G]uidelines' definition of crime of violence." *United States v. Wilson*, 880 F.3d 80, 83 (3d Cir. 2018) (citing *United States v. Chapman*, 866 F.3d 129, 133 (3d Cir. 2017)). When conducting the categorical approach analysis under the elements of force clause, we ask whether "the use, attempted use, or threatened use of physical force against another person is categorically an element of the offense of

---

[5] *Johnson* addressed whether an offense constituted a "violent felony" under the Armed Career Criminal Act, 18 U.S.C. § 924(e). Because the definition of crime of violence bears "substantial similarity" to the definition of violent felony in the ACCA, we apply authority interpreting one definition to the other. *See United States v. Marrero*, 743 F.3d 389, 394 n.2 (3d Cir. 2014) (citation omitted).

16

conviction." *United States v. Ramos*, 892 F.3d 599, 606 (3d Cir. 2018). As stated above, physical force "means *violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. "Accordingly, a crime is a violent one under the elements clause so long as it has an element that can be satisfied only through the use, threatened use, or attempted use of force against another person that is capable of causing that person physical pain or injury." *Ramos*, 892 F.3d at 611. That is true regardless of whether an offender could be convicted under the statute for applying force directly or indirectly. *Chapman*, 866 F.3d at 132–33.

Thus, if the state statute Amos was convicted under has an element of violent force capable of causing physical pain or injury, "then the statute proscribes a predicate crime of violence within the meaning of the Guidelines." *Ramos*, 892 F.3d at 606. But if the statute does not have such an element, it "sweeps more broadly" and the state conviction is not a predicate offense for the crime of violence sentencing enhancement. *See United States v. Brown*, 765 F.3d 185, 189 (3d Cir. 2014) (citation omitted).

A court "may 'look only to the statutory definitions'—*i.e.*, the elements—of a defendant's prior offenses, and *not* 'to the particular facts underlying those convictions.'" *Id.* (quoting *Descamps v. United States*, 570 U.S. 254, 261 (2013) (emphasis in original)). This approach requires that a court both "ignore the actual manner in which the defendant committed the prior offense" and "presume that the defendant did so by engaging in no more than 'the minimum conduct criminalized by

17

the state statute.'" *Ramos*, 892 F.3d at 606 (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013)).

However, when a defendant was convicted under a "divisible" statute that defines multiple crimes, we apply the "modified categorical approach." *United States v. Abdullah*, 905 F.3d 739, 744 (3d Cir. 2018) (citation omitted). This approach allows us to look beyond the statute of conviction and identify the specific statutory provision under which the defendant was previously convicted. *Id.* We may look to so-called *Shepard* documents, including the charging document, written plea agreement, and plea colloquy transcript. *Id.*; *see Shepard v. United States*, 544 U.S. 13, 16 (2005). If a specific provision is identified, the categorical approach is applied to that one provision. *Abdullah*, 905 F.3d at 744. If the records are unclear, the Government must "show that *all* of the statute's offenses [meet] the federal definition" of crime of violence. *Pereida v. Wilkinson*, 141 S. Ct. 754, 766 (2021) (emphasis in original).

C.  The Pennsylvania Second-Degree Aggravated Assault Statute

The state court records show that Amos was charged with and entered a guilty plea to aggravated assault as a felony in the second-degree generally. In 2008, when Amos committed the crime, the Pennsylvania aggravated assault statute included seven subsections enumerating an aggravated assault. Subsections one and two are felonies in the first-degree, whereas subsections three through seven are felonies in the second-degree. *See* 18 Pa. Cons. Stat. § 2702(b).

A person is guilty of aggravated assault if he:

18

(3) attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c), in the performance of duty;

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon;

(5) attempts to cause or intentionally or knowingly causes bodily injury to a teaching staff member, school board member or other employee, including a student employee, of any elementary or secondary publicly-funded educational institution, any elementary or secondary private school licensed by the Department of Education or any elementary or secondary parochial school while acting in the scope of his or her employment or because of his or her employment relationship to the school;

(6) attempts by physical menace to put any of the officers, agents, employees or other persons enumerated in subsection (c), while in the performance of duty, in fear of imminent serious bodily injury; or

(7) uses tear or noxious gas as defined in section 2708(b) (relating to use of tear or noxious gas in labor disputes) or uses an electric or electronic incapacitation device against any officer, employee or other person enumerated in subsection (c) while acting in the scope of his employment.

19

*Id.* § 2702(a)(3)–(7).

At sentencing, the Government argued that Amos's 2008 Pennsylvania state aggravated assault conviction qualified as a predicate crime of violence. Under *Ramos*, the modified categorial approach applies because the Pennsylvania aggravated assault statute is divisible. *See* 892 F.3d at 607–10. Accordingly, the Government provided the District Court with the state court Certified Records of Conviction. The Government conceded that the *Shepard* documents do not indicate what subsection of Section 2702(a) Amos was convicted under, except to say it was a felony in the second-degree as listed on the written guilty plea colloquy. The Government argued the crime of violence enhancement applied because each of the possible five subsections is a crime of violence. Amos's trial counsel confined his argument in opposition to subsection six. *See* App'x 240 ("Your Honor, my argument is limited to § 6."). The court agreed with the Government and applied the sentencing enhancement, which resulted in a sentence of 62 months' imprisonment followed by three years of supervised release.

### D. 18 Pa. Con. Stat. § 2702(a)(3) Is Not a Crime of Violence[6]

As previously stated, the Government must show that all subsections of Pennsylvania's aggravated assault statute

---

[6] Because Amos succeeds under subsection three, we need not address whether the other subsections of aggravated assault in the second-degree are crimes of violence. Likewise, we need not address whether the Government waived its right to argue

meet the federal definition of crime of violence. *See Pereida*, 141 S. Ct. at 766. If the Government is unable to do so on even one subsection, then Amos prevails in his argument that his conviction under the statute is not a crime of violence, and he is thus not subject to the sentencing enhancement.

We start and end our analysis by applying our recent decision in *United States v. Jenkins*, 68 F.4th 148 (3d Cir. 2023). In *Jenkins*, we addressed whether 18 Pa. Cons. Stat. § 2702(a)(3)—one of the exact subsections at issue here—is a violent felony under the ACCA. We relied on the Pennsylvania Supreme Court's decision *United States v. Harris*, 289 A.3d 1060 (Pa. 2023), to find "that Section 2702(a)(3) can at least be violated by a failure to act, so it is not a violent felony." *Jenkins*, 68 F.4th at 152. Like the subsection addressed in *Harris*, the statutory language in Section 2702(a)(3) makes no mention of force and there is no reference "to the manner by which an injury must be inflicted." *Id.* at 153 (quoting *Harris*, 289 A.3d at 1070).

That affirmative holding controls here because of the "substantial similarity" between the definitions of violent felony in the ACCA and crime of violence in the Guidelines. *See Marrero*, 743 F.3d at 394 n.2 (citation omitted). The *Shepard* documents do not rule out that Amos was convicted under subsection three of the Pennsylvania aggravated assault statute, and under *Jenkins*, subsection three is not a crime a violence. Accordingly, Amos must be resentenced.

---

that Amos was not convicted under subsection seven and whether a closed record on remand is necessary.

## IV.    Conclusion

For the foregoing reasons, we will affirm the District Court's order denying Amos's motion to suppress. Additionally, because Section 2702(a)(3) is not a crime of violence, we vacate Amos's sentence and remand for resentencing consistent with this opinion.