# COURT OF APPEALS OF VIRGINIA

## Record No. 1830-24-1

MARQUIS DONTE CHISHOLM, JR.

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Causey, White and Frucci

Argued by videoconference

Opinion Issued June 16, 2026[*]

## FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Matthew Hoffman, Judge[1]

Catherine A. Tatum, Senior Trial Attorney (Newport News Public Defender's Office, on briefs), for appellant.

David A. Stock, Senior Assistant Attorney General (Jason S. Miyares,[2] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE KIMBERLEY SLAYTON WHITE

### INTRODUCTION

This appeal concerns the limits of reasonable suspicion under the Fourth Amendment when police detain an individual based on lawful conduct and broad contextual considerations. Officers detained the appellant, Marquis Donte Chisholm, Jr., after observing what they believed to be a bulge near his waistband that appeared to be a firearm. They encountered him in an area described as high crime and interpreted ordinary nervousness and slow backward steps as

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Judge Tyneka L.D. Flythe presided over the motion to suppress hearing. Judge Matthew Hoffman accepted appellant's conditional guilty plea providing for this limited appeal.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

evasive behavior. As a result, the trial court concluded these circumstances, considered together, established reasonable suspicion sufficient to justify the detention. Officers recovered a firearm from Chisholm's person and arrested him for possession of a firearm by a violent felon, in violation of Code § 18.2-308.2. Accordingly, Chisholm appeals the trial court's denial of his motion to suppress the evidence underlying that conviction.

Because at the moment of seizure officers possessed very few particularized, objective facts linking Chisholm to criminal activity, the trial court erred in finding reasonable suspicion. Instead, under these circumstances, we find that firearm possession, presence in a high crime area, commonplace nervous reactions, and non-evasive movement did not establish reasonable suspicion to justify the detention. Accordingly, the trial court's ruling must be reversed.

BACKGROUND

On June 28, 2023, at approximately 6:00 p.m., while driving a marked patrol vehicle, Officer McLaughlin[3] of the Newport News Police Department, observed the appellant, Marquis Donte Chisholm, Jr., exiting a corner store. While driving, Officer McLaughlin observed Chisholm from approximately 10 to 15 feet away and noticed a bulge in the front waistband of Chisholm's jeans that appeared to be an imprint of a firearm. Chisholm and his friend were walking in the southeastern portion of Newport News, described as a high crime area known for gang activity, shootings, robberies, malicious woundings, and aggravated assaults. Chisholm was carrying a gallon of milk and started walking down the sidewalk with a friend in daylight.

During that time, Officer McLaughlin had not received any calls from the public indicating that a crime was occurring in the area and did not believe that Chisholm or his friend were planning to commit robbery, burglary, or any other crime. Officer McLaughlin did not know Chisholm nor have any familiarity with his criminal history. Based on his training and

---

[3] None of the officer's first names were identified in the record.

- 2 -

experience, however, Officer McLaughlin believed that Chisholm was carrying a firearm because he observed an L-shaped outline near Chisholm's waist and recognized that the waistband is a common location for carrying firearms.

Immediately thereafter, Officer McLaughlin radioed Officer Smith, who was driving a two-officer patrol unit with Officer John, as their patrol car approached the area where Chisholm and his friend were walking down the sidewalk. Officer McLaughlin then turned his patrol car around and headed in the direction of Chisholm and Officers Smith and John. Officers Smith and John were also unfamiliar with Chisholm and were unaware of his criminal history. Once the officers exited their patrol vehicle and approached Chisholm and his friend, they asked whether they had any firearms on them.

Even though Chisholm told officers he did not have a firearm, Officer Smith stated that they were going to check whether he had one. In response, Chisholm told Officers Smith and John, "you can't check me, we just came out of the store," and slowly took several steps backward while facing the officers and carrying a gallon of milk in his right hand. At that time, Officers Smith and John did not observe a bulge near Chisholm's waist and did not ask whether he possessed a concealed handgun permit.

According to Officer Smith, when Chisholm began slowly backing away, he appeared "visibly nervous," and the officer testified that, based on his training and experience, such movement indicated pre-flight behavior. Officer Smith testified that Chisholm's "breath rate change[d]" when officers began speaking with him, characterizing his nervous appearance as "a very abnormal reaction." At that point, Officer Smith observed the bulge near Chisholm's belt buckle previously reported by Officer McLaughlin and suspected that Chisholm was carrying a firearm.

At that moment, Officer McLaughlin arrived on the scene and began approaching Chisholm from behind. As Chisholm slowly backed away from Officers Smith and John, Officer Smith told him that he was "backing up into [his] partner," Officer McLaughlin. Officer McLaughlin then grabbed Chisholm's wrist and informed him that he was being detained. However, both Officers Smith and McLaughlin testified that Chisholm never attempted to flee at any point during the encounter or detention.

During the detention, Officer Smith used the back of his hand to touch Chisholm's waist in the area of the bulge where he believed the firearm was located. When tapping the bulge, he felt a sharp, hard object that was consistent with a firearm. Afterwards, he lifted Chisholm's shirt, found the firearm, and removed it from his person. Officers arrested Chisholm, who entered a conditional guilty plea to possession of a firearm by a violent felon, in violation of Code § 18.2-308.2.

TRIAL COURT'S RULING

At the suppression hearing, Chisholm argued that the officers lacked reasonable suspicion to conduct an investigative detention because, at the moment of seizure, they possessed no specific and articulable facts indicating that he was engaged in criminal activity. Chisholm contended that the seizure occurred when the officers approached him and asserted their authority by announcing their intent to search him, not later when physical force was applied. As a result, any alleged nervousness or evasive, pre-flight behavior that occurred after the officers' show of authority could not be considered in the reasonable suspicion analysis. Thus, at the time officers detained him, the only information they had was viewing a bulge that might be a firearm.

Furthermore, he argued that presence in a high crime area added little, if any, weight to the analysis because it is a generalized factor that cannot substitute for individualized suspicion. Moreover, the officers received no calls for service, observed no criminal conduct, did not

- 4 -

believe that Chisholm was planning a crime, and were unfamiliar with his criminal history. Therefore, under the circumstances, the only information available to the officers at the time of the seizure was their view of a bulge that might be a firearm.

According to Chisholm, however, this Court's precedent makes clear that possession of a firearm, standing alone, is not sufficient to establish reasonable suspicion under the Fourth Amendment to justify an investigative detention. Rather, there must be other indicators of criminality before officers may rely on the possession of a firearm in the reasonable suspicion analysis. He argued that because the officers' only basis for detaining Chisholm was the possibility that he possessed a firearm, that fact, standing alone, was insufficient to establish reasonable suspicion under the Fourth Amendment. Accordingly, Chisholm asserted that the motion to suppress should be granted, the firearm recovered during the unlawful detention must be excluded from evidence, and the conviction for possession of a firearm by a violent felon should be dismissed.

The trial court, however, rejected Chisholm's argument. Instead, the court ruled in favor of the Commonwealth, finding the officers had reasonable suspicion to detain Chisholm based on the totality of the circumstances. The trial court determined that the seizure occurred when Officer McLaughlin grabbed Chisholm's wrist and therefore relied on officers' belief Chisholm possessed a firearm, along with his alleged nervous demeanor, his backward steps, and the characterization of the area as high crime. The court credited Officer McLaughlin's and Officer Smith's testimony that they observed an L-shaped bulge in Chisholm's waistband consistent with a firearm. It also found that carrying a concealed firearm is presumably a misdemeanor unless one has a permit to carry under Code § 18.2-308.

The court further considered the officers' testimony that the encounter occurred in a high crime area known for violent offenses. The court also credited Officer Smith's testimony that

Chisholm appeared visibly nervous and slowly backed away when approached and accepted the officer's characterization of that movement as indicative of pre-flight behavior. Thus, the court found that the officers' beliefs that Chisholm was carrying a firearm, combined with the high crime nature of the area, and his demeanor and movement during the encounter, were sufficient to establish reasonable suspicion under the totality of the circumstances.

On October 4, 2024, Chisholm entered a universal plea agreement encompassing five charges. However, only the conviction for possession of a firearm by a violent felon is at issue on appeal. As to that charge, Chisholm entered a conditional guilty plea pursuant to Code § 19.2-254. With the Commonwealth's agreement, he preserved his right to appeal the trial court's denial of his motion to suppress the evidence underlying the firearm possession charge. Pursuant to the agreement, Chisholm was sentenced to a mandatory minimum term of five years of active incarceration, with an additional one-year suspended sentence, as required by Code § 19.2-295.2. On November 1, 2024, Chisholm filed his notice of appeal with this Court, and the final sentencing order reflecting the conditional guilty plea was entered on November 12, 2024. On appeal, Chisholm argues the motion to suppress should have been granted and the conviction for possession of a firearm by a violent felon should be overturned.

ANALYSIS

"The constitutionality of a search under the Fourth Amendment 'involve[s] questions of both law and fact.'" *Myers v. Commonwealth*, 83 Va. App. 656, 664 (2025) (alteration in original) (quoting *Lawson v. Commonwealth*, 55 Va. App. 549, 554 (2010)). "Appellate review of a trial court's denial of a defendant's motion to suppress is de novo when the defendant claims that the evidence sought to be suppressed was seized in violation of the Fourth Amendment." *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008). However, when "reviewing a trial court's denial of a motion to suppress, 'we determine whether the accused has met his burden to show

- 6 -

that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error.'" *Knight v. Commonwealth*, 71 Va. App. 771, 782 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015)).

Thus, "we are 'bound by the trial court's findings of historical fact unless "plainly wrong" or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" *Myers*, 83 Va. App. at 664 (quoting *Cantrell*, 65 Va. App. at 56). Nevertheless, we must "review[] *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020).

"The Fourth Amendment of the United States Constitution, as incorporated in and applied to the states through the Fourteenth Amendment, guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Hill v. Commonwealth*, 68 Va. App. 610, 617 (2018) (alteration in original). Indeed, "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

"In order to deter law enforcement officials from violating the Fourth Amendment by stopping persons without reasonable suspicion . . . , the Supreme Court has directed that 'all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source.'" *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (second alteration in original) (quoting *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)). "This exclusionary rule is supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *Id.*

- 7 -

However, "[t]he [F]ourth [A]mendment does not proscribe all seizures, only those that are 'unreasonable.'" *Hodnett v. Commonwealth*, 32 Va. App. 684, 690 (2000) (second and third alterations in original) (quoting *Welshman v. Commonwealth*, 28 Va. App. 20, 30 (1998) (en banc)).

"Moreover, 'even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . and request consent to search[,] as long as the police do not convey a message that compliance with their requests is required.'" *Londono v. Commonwealth*, 40 Va. App. 377, 399 (2003) (alterations in original) (quoting *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). "Police officers do not violate the Fourth Amendment when they stop and question an individual if they have reasonable articulable suspicion that the person is engaged in criminal activity or when the person's encounter with the police is consensual." *Harris v. Commonwealth*, 266 Va. 28, 32 (2003) (citation omitted). "Fourth Amendment scrutiny is triggered, however, the moment an encounter 'loses its consensual nature.'" *Roulhac v. Commonwealth*, 50 Va. App. 8, 15 (2007) (quoting *Payne v. Commonwealth*, 14 Va. App. 86, 88 (1992)).

Under the Fourth Amendment, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "In essence, '[w]hether a seizure has occurred for Fourth Amendment purposes depends upon whether, under a totality of the circumstances, a reasonable person would have believed that he or she was not free to leave.'" *Brown v. City of Danville*, 44 Va. App. 586, 603 (2004) (alteration in original) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 199-200 (1997) (en banc)). According to Virginia law, when determining whether a reasonable person would feel free to leave an encounter with the police, there are several factors to consider. *Harris*, 266 Va. at 32.

Those factors include: "the threatening presence of a number of police officers, the display of weapons by officers, physical contact between an officer and a citizen, an officer's language or tone of voice compelling compliance, . . . and whether a citizen was told that he or she was free to leave." *Id.* As a result, "[t]here are no bright line rules to follow when determining whether a reasonable and articulable suspicion exists to justify an investigatory stop. Instead, courts must consider 'the totality of the circumstances—the whole picture.'" *Hoye v. Commonwealth*, 18 Va. App. 132, 134-35 (1994) (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)).

"While the police are regularly required to rely on their experience and instincts, the [F]ourth [A]mendment requires, at a minimum, that they possess articulable facts giving rise to reasonable suspicion of criminal activity before depriving a citizen of his or her privacy or freedom of movement." *Goodwin v. Commonwealth*, 11 Va. App. 363, 367 (1990). Indeed, according to *Terry* "and its progeny, a police officer 'may constitutionally conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Bland v. Commonwealth*, 66 Va. App. 405, 413 (2016) (quoting *Beasley v. Commonwealth*, 60 Va. App. 381, 395 (2012)).

"Under the Fourth Amendment, 'the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of *noncriminal* acts.'" *Rabb v. Commonwealth*, 50 Va. App. 577, 583 (2007) (quoting *Sokolow*, 490 U.S. at 10). Rather, "[r]easonable, articulable suspicion requires an officer to possess, at the time of the stop, 'a particularized and objective basis for suspecting the particular person stopped[.]'" *Mitchell v. Commonwealth*, 73 Va. App. 234, 246 (2021) (second alteration in original) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). "Whether reasonable suspicion exists is 'based on an assessment of the totality of the circumstances.'" *McArthur v.*

*Commonwealth*, 72 Va. App. 352, 359 (2020) (quoting *Harris v. Commonwealth*, 276 Va. 689, 695 (2008)).

Likewise, even though "a suspect's presence in a high crime area, standing alone, is not enough to support a reasonable particularized suspicion, it is a relevant contextual consideration in a *Terry* analysis." *Whitaker v. Commonwealth*, 279 Va. 268, 276 (2010). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Similarly, "while headlong flight is not necessarily indicative of wrongdoing, it is a pertinent factor in determining reasonable suspicion." *Whitaker*, 279 Va. at 276. Additionally, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124.

However, the Fourth Amendment "does prevent the police from stopping and frisking individuals in the absence of 'reasonable suspicion' that the individual has committed, or is about to commit, a crime." *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131 (6th Cir. 2015) (quoting *Terry*, 392 U.S. at 27). Indeed, "[m]ore than an 'inchoate and unparticularized suspicion or "hunch"' is needed to stop and frisk an individual." *Id.* (quoting *Terry*, 392 U.S. at 27). Rather, "the officer must identify 'specific and articulable facts' of criminality." *Id.* (quoting *Terry*, 392 U.S. at 27). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Mitchell*, 73 Va. App. at 246-47 (quoting *Bland*, 66 Va. App. at 413).

Instead, reasonable suspicion "requires only 'some minimal level of objective justification.'" *Williams*, 71 Va. App. at 482 (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 561 (2017)). Thus, when "evaluating whether an investigative detention is unreasonable,

common sense and ordinary human experience must govern over rigid criteria." *Hoye*, 18 Va. App. at 135 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).  Therefore, "[w]hether a search or seizure is unreasonable is determined by balancing the individual's right to be free from arbitrary government intrusions against society's countervailing interest in preventing or detecting crime and in protecting its law enforcement officers." *Stanley v. Commonwealth*, 16 Va. App. 873, 875 (1993).

Here, we find that the detention occurred when Officer McLaughlin grabbed Chisholm's wrist.[4]  As stated earlier, a person has been seized when "under a totality of the circumstances, a reasonable person would have believed that he or she was not free to leave." *City of Danville*, 44 Va. App. at 603 (quoting *McGee*, 25 Va. App. at 199-200).  The relevant factors to consider are the number of police officers, whether officers displayed their weapons, the tone of their voices, and physical conduct between officers and Chisholm. *Mendenhall*, 446 U.S. at 554.

In this case, Chisholm believed that the detention occurred when officers approached him while he was walking down the street.  However, the United States Supreme Court has been clear that when a person is approached by police officers, "he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983).  Therefore, the officers approaching Chisholm and asking whether he was carrying any weapons did not start the detention since a reasonable person under the circumstances would have been free to ignore the officers and keep walking.

---

[4] On appeal, the Commonwealth argued the encounter between Chisholm and officers was a consensual encounter.  At the suppression hearing, however, the Commonwealth conceded numerous times that it was "not a consensual encounter" and argued that Chisholm had "not been seized or detained until Officer McLaughlin puts his hands" on him.  Therefore, the Commonwealth cannot now argue, contrary to its argument at the hearing, that the encounter between Chisholm and officers was consensual on appeal.  Hence, this Court "will not consider an argument on appeal which was not presented to the trial court." *See* Rule 5A:18; *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998).

Instead, when viewing the facts in the light most favorable to the Commonwealth, we agree that the seizure began when Officer McLaughlin grabbed Chisholm's wrist and informed him that he was being detained. When Officers Smith and John initially approached Chisholm, they did not display their weapons, use an aggressive tone, or make physical contact with him. Although Officers Smith and John began walking toward Chisholm while Officer McLaughlin approached from behind, any restraint on Chisholm's freedom of movement occurred almost simultaneously with Officer McLaughlin grabbing his wrist.

Reasonable suspicion must be assessed based on the facts known to the officers at the time of the seizure. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000). Thus, in either scenario, the relevant factors include the officers' belief that Chisholm possessed a firearm, the character of the area where the encounter occurred, and Chisholm's alleged nervousness and evasive, pre-flight behavior. Therefore, we evaluate reasonable suspicion based on the facts known when Officer McLaughlin grabbed Chisholm's wrist.

Because Chisholm did not challenge the pat-down below on appeal, we consider only whether officers had reasonable suspicion to detain him at the moment of seizure.[5] In assessing reasonable suspicion under the totality of the circumstances, we recognize that officers may rely on objective facts informed by their training and experience. *United States v. Smith*, 263 F.3d 571, 593 (6th Cir. 2001). "However, some factors may be 'outrightly dismissed,' because they are 'so innocent or susceptible to varying interpretations as to be innocuous.'" *Id.* (quoting

---

[5] At the suppression hearing, Chisholm did not challenge whether officers had reasonable suspicion to conduct a pat-down and instead focused on whether they had reasonable suspicion to conduct an investigatory detention. Chisholm does not argue on appeal that the Commonwealth lacked reasonable suspicion to conduct a pat-down, but even if he had, we would not consider the argument. *See* Rule 5A:18. *See also W. Alexandria Props., Inc. v. First Va. Mortg. & Real Est. Inv. Tr.*, 221 Va. 134, 138 (1980) ("On appeal, though taking the same general position as in the trial court, an appellant may not rely on reasons which could have been but were not raised for the benefit of the lower court.").

*United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)). "Although the factors asserted by the government are related, and must be considered as a whole, they also must be examined in some orderly fashion, which typically involves a brief discussion of each factor and its weight in the analysis." *Id.* at 591.

We acknowledge in some cases "[i]t is possible for factors, although insufficient individually, to add up to a reasonable suspicion—that is the nature of the totality of the circumstances test." *Karnes v. Skrutski*, 62 F.3d 485, 496 (3d Cir. 1995). Here, however, "we think it impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Id.* Therefore, "we do not analyze each factor in isolation, [but rather] we will describe these factors separately in order to explain why they were insufficient in the aggregate." *Id.* at 495.

The mere presence of a firearm, or a bulge suggesting one, cannot by itself establish reasonable suspicion for detention under the Fourth Amendment. "The Commonwealth, like many other states, authorizes individuals to carry a concealed firearm so long as he or she has 'a valid concealed handgun permit.'" *Commonwealth v. Johnson*, No. 1799-19-2, slip op. at 10 (Va. Ct. App. Apr. 28, 2020)[6] (interpreting Code § 18.2-308). Because the right to bear arms is a fundamental right, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

Therefore, when determining whether an officer has reasonable suspicion to detain a person, "[a]n individual's choice to exercise his fundamental right to bear arms cannot, standing alone, serve as the basis for reasonable suspicion or probable cause that in doing so, he is

---

[6] "Unpublished opinions of this Court, while having no precedential value, are nevertheless persuasive authority." *Samartino v. Fairfax Cnty. Fire and Rescue*, 64 Va. App. 499, 508 n.2 (2015).

- 13 -

committing a crime."[7] *Johnson*, slip op. at 10. Indeed, "the presence of a bulge under a shirt suggesting one is armed is not automatically indicative of criminal activity." *Id.* at 9. Nevertheless, the trial court held that there was a presumption it was unlawful to carry a firearm in public. But as a matter of constitutional principle, "[b]eing a felon in possession of a firearm is not the default status." *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013).

Because carrying a concealed firearm may be lawful with a permit, the mere possibility that an individual lacks a permit does not create reasonable suspicion. Rather, officers must have some particularized basis to believe the possession is unlawful. Otherwise, "[p]ermitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states."[8] *Id.* As a result, "we do not presume that an individual carrying a concealed firearm must be in violation of the law in doing so." *Johnson*, slip op. at 10.

However, "[i]f there are other indicia of criminality present, the presence of a bulge consistent with a weapon can be considered under the totality of the circumstances in determining whether reasonable suspicion or probable cause exist." *Id.* Therefore, if officers had other evidence of criminality besides a bulge appearing to be a weapon, they would have "[a] reasonable suspicion that a suspect is carrying a concealed weapon (without a permit to do

---

[7] *See United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (holding that a "mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, [does not] justify an officer in stopping a suspect absent the reasonable suspicion required by *Terry*"); *United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993) (holding that the presence of a firearm, without evidence of illegality or other criminal conduct, does not alone establish reasonable suspicion); *Northrup*, 785 F.3d at 1131-32 (holding that in an open-carry jurisdiction, the mere possession of a firearm cannot be the basis for a stop and that the exercise of a constitutional right cannot itself be suspicious); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) (holding "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention").

[8] See *Northrup*, 785 F.3d at 1132 ("To allow stops in this setting would effectively eliminate Fourth Amendment protections for lawfully armed persons." (quoting *King*, 990 F.2d at 1559)).

so) [because it] establishes the reasonable suspicion of criminal activity required by *Terry*."
*Miles v. Commonwealth*, No. 1412-12-2, slip op. at 6 (Va. Ct. App. Feb. 11, 2014).[9] In contrast, without evidence of criminality, "[o]fficers may not seize and search an individual based solely on the presence of what appears to be a concealed firearm without establishing first that it is concealed in violation of the law." *Johnson*, slip op. at 11.

In the case now before the Court, we focus not on the suspicion of the possession of a firearm but instead on the suspicion of criminal activity.[10] When officers approached Chisholm, they did not know him, were unaware of his criminal history, and did not observe any suspicious or criminal behavior. Officers Smith and John did not ask whether he had a concealed carry permit. Instead, they asked if he was carrying any weapons and then immediately informed him that they were going to check him based on information they received from Officer McLaughlin. Thus, the only reason Officers Smith and John approached Chisholm was because Officer McLaughlin believed he may be in possession of a firearm. Nevertheless, that alone is not enough to articulate reasonable suspicion to justify detention. Rather, there must be additional, objective evidence of criminality.

In this case, the Commonwealth relies on other factors, including that the encounter occurred in a purported high crime area, that Chisholm appeared nervous when officers approached him, and that he engaged in alleged evasive, pre-flight behavior by slowly walking

---

[9] *See* footnote 5, *supra*.

[10] To be sure, the right to detain an individual based on the suspected presence of a firearm should not be confused with the right to conduct a pat-down of an individual for weapons when the individual is detained on the suspicion of some criminal activity afoot. For lawful detentions, officers only need reasonable, articulable suspicion that criminal activity is occurring. *Terry*, 392 U.S. at 21. In contrast, officers have the authority to conduct a pat-down for weapons only if they have reasonable suspicion that criminal activity is occurring "*and that the persons with whom [they are] dealing may be armed and presently dangerous.*" *Id.* (emphasis added). Here, however, we will only examine whether officers had reasonable suspicion to conduct a lawful detention.

backward. Even when viewed in the light most favorable to the Commonwealth, the facts do not establish reasonable suspicion sufficient to justify the detention.

Although we accept the trial court's factual finding that the area where Chisholm was detained was a high crime area, the record is devoid of any evidence that Chisholm engaged in or was suspected of engaging in criminal conduct linking him to any such crime. Accordingly, the high crime nature of the area cannot be attributed to his conduct or be used to support reasonable suspicion. It certainly cannot be ignored that Chisholm had just left the neighborhood market carrying groceries.

The government must evaluate the specific facts and circumstances when suspecting criminal activity, because "[a] person's Fourth Amendment rights are not lessened simply because he or she happens to live or travel in a 'high crime' area." *McCain v. Commonwealth*, 275 Va. 546, 553 (2008). Likewise, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124. That is because "presence in a high crime [area] is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry." *Id.* at 139 (Stevens, J., concurring in part and dissenting in part). Indeed, the "demand for specificity in the information upon which police action is predicated is *the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence*." *United States v. Cortez*, 449 U.S. 411, 418 (1981) (quoting *Terry*, 392 U.S. at 21 n.18).

Consistent with that teaching, the Fourth Amendment's requirement of specificity demands a nexus between the particular crime prevalent in a high crime area and the defendant's conduct indicating likely involvement in that crime. In most federal cases, courts have identified some combination of "(1) a nexus between the type of crime most prevalent or common in the

area and the type of crime suspected in the instant case,"[11] "(2) limited geographic boundaries of the 'area' or 'neighborhood' being evaluated,"[12] or "(3) temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue."[13] *United States v. Wright*, 485 F.3d 45, 53-54 (1st Cir. 2007).

Here, however, when considering Officer McLaughlin observed Chisholm in a high crime area, the Commonwealth failed to satisfy any of those requirements. It identified no nexus between the crimes purportedly prevalent in the area and the offense Chisholm was suspected of committing. It did not define or limit the geographic boundaries of the area in which Chisholm was detained, nor did it establish any temporal link between heightened criminal activity and the time or location of the stop.

As stated earlier, Chisholm was walking down the street after purchasing groceries from a corner store with a friend in broad daylight. There is nothing in the record that Chisholm was going to commit any crime such as robbery, burglary, or other criminal activity involving firearms. Officer McLaughlin also testified that he did not suspect or observe Chisholm engaging in criminal activity when he first saw him walking down the sidewalk. Moreover, "the police had no information, such as a tip or police report, suggesting that [Chisholm] was

---

[11] *See Wardlow*, 528 U.S. at 124 (emphasizing that the officers suspected narcotics activity and that the encounter occurred in an area "known for heavy narcotics trafficking," thus providing a nexus between the suspected offense and the location). *See also United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001) (recognizing that reliance on a high crime area is proper where officers articulate a connection between the type of crime frequently occurring in the area and the offense the defendant was suspected of committing).

[12] *See United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir. 2006) (holding that reliance on a high crime area was proper where the record contained evidence of frequent criminal activity at the specific intersection where the defendant was stopped).

[13] *See United States v. Bailey*, 417 F.3d 873, 874-75, 877 (8th Cir. 2005) (holding that it was proper to consider the location a high crime area where the record showed recent criminal activity at the specific location of the stop).

involved in criminal activity." *Goodwin*, 11 Va. App. at 367. Additionally, none of the officers knew Chisholm nor were they aware of his criminal history. As a result, the Commonwealth failed to establish any nexus between the area's crime and Chisholm, as officers neither suspected nor observed him engaging in criminal activity.

Furthermore, the Commonwealth failed to demonstrate evidence of frequent crime in the specific area where Chisholm was detained. Instead, the Commonwealth relied on a generalized "high crime area" designation and applied it broadly to the southeastern portion of Newport News, without tying that characterization to Chisholm's conduct or to the specific location where he was detained. Moreover, the Commonwealth did not provide any evidence of heavy crime occurring around that time in the specific area where Chisholm was detained. Although Officer Smith did mention there were shootings, robberies, and other crimes prevalent in the southeastern portion of Newport News, the record does not indicate there was any heavy crime occurring in the specific area where Chisholm was detained.

Thus, a high crime area "counts among the totality of the circumstances we consider, but it does little to support the claimed particularized suspicion as to [Chisholm]." *United States v. Massenburg*, 654 F.3d 480, 488 (4th Cir. 2011). Because the officers failed to identify any nexus between Chisholm's conduct and criminal activity in the area where he was detained, the "high crime area" designation adds little to the reasonable suspicion analysis. Rather, Chisholm's "[p]resence in a high-crime area . . . is as likely an explanation for innocent and non-dangerous gun possession as it is an indication that gun possession is illegal or dangerous, and it does nothing to help the police tell the difference." *United States v. Robinson*, 846 F.3d 694, 715 (4th Cir. 2017) (Harris, J., dissenting). Otherwise, officers could treat ordinary, non-criminal conduct, such as Chisholm's, as suspicious simply because a person lives in, travels through, or goes about daily life in a high crime area. Hence, officers could apply the "high crime" label

- 18 -

broadly to areas in the absence of individualized, articulable facts suggesting criminal wrongdoing. Accordingly, under these circumstances, Chisholm's presence in a high crime area adds no meaningful weight to the reasonable suspicion analysis.

The Virginia Supreme Court has also held that officers may not attribute a high crime area to a defendant when they do not observe suspicious or illegal activity. In *McCain*, the Virginia Supreme Court acknowledged that officers may consider whether an encounter occurs in a high drug area as part of the overall context. 275 Va. at 553. However, the Court made clear that a defendant's mere presence in such an area does not, by itself, support an inference of criminal activity. *Id.* The Court further rejected the officers' attempt to attribute criminal significance to McCain's brief entry into a residence where a drug deal had occurred months earlier and his quick return to his parked vehicle. *Id.* Instead, the Court found that the officers had no evidence of McCain's purpose for entering the house and did not observe any drug transactions or other suspicious conduct. *Id.* Absent such evidence, the Court held that the officers could not reasonably infer that McCain had purchased drugs simply because of the location and his movements.[14]

The same reasoning controls here. Officers observed Chisholm walking down a public street in broad daylight while carrying groceries. They received no report of criminal activity, observed no suspicious behavior, had never interacted with him, were unaware of his criminal history, and possessed no individualized information suggesting unlawful conduct. Like *McCain*, the officers' attempt to attach criminal significance to otherwise innocent behavior rests

---

[14] *See Brown v. Texas*, 443 U.S. 47, 52 (1979) (rejecting reasonable suspicion where the record showed no indication that it was unusual for individuals to be present in the alley and explaining that "[t]he fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct").

- 19 -

on speculation rather than objective, particularized facts. Accordingly, the trial court erred in crediting the "high crime area" factor in its reasonable suspicion analysis.

Even when the evidence is viewed in the light most favorable to the Commonwealth, the Commonwealth does not support its claim that Chisholm exhibited any signs of nervousness rising beyond ordinary reactions to police presence. Therefore, the trial court's acceptance of that inference was plainly wrong.

The Commonwealth relied heavily on Chisholm's alleged nervousness to justify the detention, but the record reflects nothing more than ordinary, generalized reactions that courts have repeatedly held are insufficient to establish reasonable suspicion. At the suppression hearing, the Commonwealth argued that Chisholm appeared "visibly nervous" when officers approached him because his "breath rate change[d]," which Officer Smith characterized as "a very abnormal reaction." "Generally, however, 'nervousness is of limited significance in determining reasonable suspicion.'" *United States v. Jones*, 269 F.3d 919, 928 (8th Cir. 2001) (quoting *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994)).

"Although there are a plethora of cases referring to a defendant appearing nervous, nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) (footnote omitted). "[W]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials." *United States v. Barron-Cabrera*, 119 F.3d 1454, 1461 (10th Cir. 1997) (quoting *United States v. Peters*, 10 F.3d 1517, 1521 (10th Cir. 1993)). Moreover, "it is common for most people 'to exhibit signs of nervousness when confronted by a law enforcement officer' whether or not the person is currently engaged in criminal activity." *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir.

1998) (quoting *Wood*, 106 F.3d at 948). Therefore, "absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion." *Id.*

Courts have defined "unusually nervous behavior" as "shaking hands, heavy breathing, and providing inconsistent answers." *Massenburg*, 654 F.3d at 490 (quoting *United States v. Mayo*, 361 F.3d 802, 806 (4th Cir. 2004)). Here, the record reflects none of those hallmarks. Chisholm did not exhibit shaking hands, heavy breathing, or provide inconsistent answers. Although his breathing rate may have changed during the encounter, such a reaction is common when interacting with police and does not suggest that a person has engaged in, or is about to engage in, criminal activity. Accordingly, the generic signs of nervousness the Commonwealth relied upon add little, if any, weight to the reasonable suspicion analysis.

When reviewing reasonable suspicion, we must evaluate based on common sense because "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Likewise, the Commonwealth's reliance on categorizing Chisholm slowly walking several steps backwards as indicative of evasive, pre-flight behavior, is not supported by the record and rests on mere speculation. As such, the Commonwealth's characterization of the defendant's conduct as "pre-flight" or "evasive" is unsupported by common sense inferences required under Fourth Amendment analysis.

At the time of the encounter, the defendant was carrying a gallon of milk in one hand and was facing two officers directly in front of him, with another officer positioned behind him. Accordingly, Chisholm was surrounded by three armed officers and was not reasonably capable of fleeing. Moreover, one of the officers informed Chisholm that he was "backing up into [his] partner" and then was immediately grabbed and detained by Officer McLaughlin. Most

importantly, Officers McLaughlin and Smith both admitted that Chisholm never attempted to flee before or during detention.

Under those circumstances, Chisholm was neither physically capable of fleeing nor behaving in a manner reasonably suggestive of imminent flight or evasive behavior. Indeed, "[w]alking away from the police hardly amounts to the headlong flight . . . and of course would not give rise to reasonable suspicion by itself, even in a high-crime area[.]" *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000). Thus, "[w]e decline to equate [Chisholm's] few backward steps upon seeing several uniformed officers rush toward him with headlong flight."[15] *United States v. Lowe*, 791 F.3d 424, 434 (3d Cir. 2015). Rather, "a few startled steps back in the face of onrushing, armed police officers is entirely consistent with a surprised reaction and even acquiescence."[16] *Id.*

Indeed, Chisholm did not even have the opportunity to turn "around in an attempt to walk, much less run." *Id.* Therefore, "these few steps backward hardly could transform his limited movement in response to the onrushing officers into flight" or some other form of evasion. *Id.* As a result, the Commonwealth's characterization of Chisholm's backward movement as evasive or pre-flight behavior is not supported by the record and cannot sustain a

---

[15] *See United States v. Johnson*, 620 F.3d 685, 691-92 (6th Cir. 2010) (holding that a suspect who "looks like he *might* run" but did not actually flee had not engaged in flight, and cautioning that courts may not treat speculative impressions of possible flight as evasive conduct); *see also Moreno v. Baca*, 431 F.3d 633, 643 (9th Cir. 2005) (rejecting the characterization of a suspect's act of walking away from police as the type of "headlong flight" and recognizing that such conduct may reflect disengagement rather than evasion).

[16] *See Lowe*, 791 F.3d at 434 (rejecting the government's characterization of the defendant's conduct as flight where the defendant took a few steps backward while facing approaching officers, concluding that such movement was consistent with a surprised and non-evasive reaction and declining to equate it with headlong flight sufficient to support reasonable suspicion). *See also State v. Thornton*, 213 N.E.3d 808, 817-18 (Ohio Ct. App. 2023) (holding that "the action of simply backing away, slowly, over a short distance, from two police officers exiting a police cruiser, in a high crime neighborhood, . . . is not sufficient to give rise to a reasonable, articulable suspicion that criminal activity is afoot").

reasonable inference of criminal activity. Accordingly, Chisholm's slow backward steps carry little, if any, weight in the reasonable suspicion analysis.

Lastly, in its brief and during oral argument, the Commonwealth argues that several of our cases are analogous to this case. However, once examined individually, they are not alike, and those cases involved materially stronger evidence supporting reasonable suspicion to conduct detentions.

The Commonwealth argues that our case is analogous to *Andrews v. Commonwealth*, 37 Va. App. 479 (2002). However, in that case, the officers developed reasonable suspicion to detain and pat-down because, unlike his two companions, the defendant refused to stop, gave dubious answers regarding his age and residence, attempted to conceal an object in his pocket, and appeared to be carrying a heavy object. *Id.* at 486. In contrast, Chisholm complied with the officers' request to stop, remained with his companion, did not attempt to conceal any objects in his pockets, and did not give any dubious answers.

Similarly, the Commonwealth's reliance on *Miles v. Commonwealth*, slip op. at 4 (Ct. App. Feb. 11, 2014), is misplaced. In *Miles*, we affirmed the trial court's finding of reasonable suspicion to conduct a detention, pat-down, and search. *Id.* at 8-9. There, officers were investigating whether the defendant was trespassing at an apartment complex around 3:00 a.m., observed him turn the right side of his body to conceal something in his pocket, and obtained his consent to search after he raised his arms in response to an officer's inquiry about weapons. *Id.* at 2-4. Here, by contrast, Chisholm was walking down a public street in broad daylight at approximately 6:00 p.m., was not observed or suspected of committing any crime, did not attempt to conceal any object, and did not consent to a search.

Likewise, *Beasley v. Commonwealth*, 60 Va. App. 381, does not support the Commonwealth's position. There, the defendant parked his vehicle at an apartment complex

marked with no-trespassing signs around 3:30 a.m. *Id.* at 396. When the officer approached, the defendant placed his hand underneath his shirt and ignored the officer's repeated instructions to keep his hands visible. *Id.* at 396-97. Instead, he continued moving his right hand in a suspicious manner, and the officer later observed his hand outside the window, suggesting he was attempting to discard something. *Id.* at 397. Under those circumstances, we affirmed the trial court's finding that the officer had reasonable suspicion to conduct a detention, pat-down, and search. But here, in contrast, Chisholm was walking in broad daylight at approximately 6:00 p.m., did not place his hand under his shirt, complied with the officers' instructions, did not move his hands in a suspicious manner, and did not appear to be discarding any objects.[17]

Even under the totality of the circumstances and when viewed in the light most favorable to the Commonwealth, the facts here do not rise to the level of reasonable suspicion required by the Fourth Amendment to justify detaining Chisholm. The officers relied on lawful conduct consistent with gun possession, a generalized high crime designation, commonplace nervousness, and non-evasive backward movement that officers themselves acknowledged did not constitute flight. In doing so, "the Government attempts to spin these largely mundane acts into a web of deception." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). None of these factors, alone or in combination, however, provides the particularized and objective basis necessary to justify detaining Chisholm.

---

[17] At oral argument, the Commonwealth also stressed that the facts of this case are like those in *Terry*. Once again, the Commonwealth's reliance is misplaced. In *Terry*, an officer observed the defendant and his companion, on multiple occasions, walk toward a store, look through its window, walk away, and then return to look through the window again. *Terry*, 392 U.S. at 6. After each observation, the men would confer with one another down the street. *Id.* They repeated this pattern five or six times each before the officer approached them. *Id.* Here, by contrast, Chisholm was not pacing around a store, was not observed engaging in any potentially criminal behavior, and had just purchased groceries from a corner store when Officer McLaughlin first noticed him.

As a result, the trial court erred by treating gun possession combined with generalized contextual factors as sufficient to establish reasonable suspicion to justify detention. Indeed, "[t]he flaw in the State's case is that none of the circumstances preceding the officers' detention of [Chisholm] justified a reasonable suspicion that he was involved in criminal conduct." *Brown v. Texas*, 443 U.S. 47, 51-52 (1979). In cases such as this, courts must adhere to the Fourth Amendment's core protections, because "the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone— whether he or she is one of the most affluent or most vulnerable members of our community." *Foster*, 634 F.3d at 249. Because the Commonwealth's theory rests on speculation or a mere hunch rather than specific, articulable facts, the seizure was unlawful, and the evidence obtained as a result must be suppressed.

CONCLUSION

For the reasons stated above, the judgment of the trial court overruling the motion to suppress is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

*Reversed and remanded.*